IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FELIPE LOPEZ,

    Petitioner,               No. CIV S-06-1628 FCD GGH P

    vs.

D.S. SISTO, et al.,

    Respondents.           <u>FINDINGS AND RECOMMENDATIONS</u>

                                /

I. <u>Introduction</u>

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 1983 petitioner was convicted of second degree murder and sentenced to 15 years to life. In this action, petitioner challenges the 2004 decision by the California Board of Prison Terms (BPT) finding him unsuitable for parole. This was petitioner's ninth parole suitability hearing. Petitioner also argues that the BPT's decision finding him unsuitable resulted in him serving a sentence that is outside the matrix established by California regulations in violation of the Eighth Amendment.

        After carefully reviewing the record, the court recommends that the petition be denied.

/////

II. Anti-Terrorism and Effective Death Penalty Act (AEDPA)

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective. Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997). The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

Petitioner raised the claims raised in this action in a habeas corpus petition filed in the Los Angeles County Superior Court. Answer, Exhibit E. The Superior Court issued a reasoned opinion denying the petition. Id. The California Court of Appeal and California Supreme Court issued unreasoned opinions denying petitioner's habeas petitions raising the claims brought in the instant action. Answer, Exhibits F, G. Accordingly, the court will consider whether the opinion of the Superior Court was an unreasonable application of the facts to the due process law surrounding parole suitability hearings. Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000) (when reviewing a state court's summary denial of a claim, the court

"looks through" the summary disposition to the last reasoned decision).

III. Background

The factual background of petitioner's offense is relevant to the analysis of petitioner's claims. The transcript from the 2004 hearing contains a factual summary of the offense:

> Lopez operated a shoe repair shop in Dutch Village Shopping Center in Lakewood, under a lease from shop owner Alfredo Napoli. On May 19th, 1982, at around 5:00 p.m., Lopez closed the shop, had two drinks of brandy and cola and smoked half of a marijuana cigarette. Lopez felt relaxed but not intoxicated and finished up some shoe repair work. Shortly after 5:00 p.m., Denise Dominguez took a pair of shoes to Lopez's shoe repair shop. As the shoes merely needed to have the bottom flaps glued, she waited for Lopez to complete the work. A struggle between Lopez and Dominguez ensued and Lopez strangled Dominguez to death. Lopez left the shop, went to a liquor store, bought a bottle of brandy and had a few drinks. Lopez drove around, then went to the home of his girlfriend, Amira, A-M-I-R-A, Cuevas, C-U-E-V-A-S, in Montebello. Cuevas noticed there were a number of cuts and scratches on Lopez's face. Lopez explained the condition of his face by telling Cuevas that two black men had robbed and fought with him at the store. Lopez stayed with Cuevas approximately 40 minutes or an hour, then drove home. At home, Lopez told his mother, brother and sisters, who all resided with Lopez, that two black men had robbed and fought with him at the store that evening. At approximately 2:00 a.m., Lopez drove back to the store. He carried the body of Denise Dominguez into his car. Lopez took the body to an alley behind the Hideaway Bar in Lakewood, where he left the body. The body was discovered lying facedown and barefoot, with its blouse completely unbuttoned and the top button of its shorts unfastened. At the time of Lopez's arrest, he had extensive scratch marks on his face and bite marks on his chest. Blood and hair were found in the bathroom of his shoe shop and on the front seat of his car. The vehicle of Dominguez remained parked outside Lopez's shoe repair shop in the Lakewood Shopping Center.

Answer, Exhibit B, pp. 21-23.

The probation report, also quoted at the 2004 hearing, contained petitioner's version of events:

> The prisoner has submitted a written statement, which is in the hands of the defense Counsel for review, prior to submission to the court. Orally, the prisoner told the Probation Officer that he is guilty of killing the victim but it was accidental. He did not mean to do it and it was a case of self-defense. The victim came to the shoe shop just at closing time and insisted that she needed some shoes dyed right away, as she was going on vacation. The prisoner agreed to paint the shoes while she waited, but it turned out they were made of plastic, not leather, and the paint absolutely ruined the shoes. The prisoner tried to stall and told her he could fix the shoes the next day, but the victim became very angry, even

4

though the prisoner agreed to pay her for the shoes if she brought in a receipt. She said she had no receipt and they were worth 65 dollars. Then she hit me with a shoe on the head and in the face and with a key holder that had jagged edges. She hit me with that in the mouth. I began to bleed from the face and when I saw all the blood, I lost control and grabbed her hands. I was afraid she would hit me again. When I grabbed her, she hit one of the machines and I pulled her off because I was afraid she would break it. She fell back on me and bit my face and scratched me with a jagged key holder on the face and neck and then she bit me again. I tried to get her off me and I held her back by the neck, so she wouldn't bite me again. I held her just one and a half minutes, not more, and suddenly felt her body go heavy, like she fainted. The blood was on my eyes and I went to wash it off my face. Then I went to her and tried to revive her and gave her mouth-to-mouth, but she didn't wake up. When I realized she wouldn't wake up, I ran out of the shop and left the body. I returned at 3:00 a.m. and moved the body into the car. I took the body to an alley and left her there. I had opened her blouse to give her artificial respiration, that's all. I never tried to rape the victim. How could I do that in my shop, which is open to everyone in a shopping center. The whole thing happened in a few minutes. I didn't want to take a life. I was trying to get her off of me. There was no malice on my part. I panicked.

Answer, Exhibit B, pp. 23-25.

IV. Discussion

Since the approximate five years since the issuance of McQuillion v. Duncan, 306 F.3d 895 (9th Cir. 2002), we know this about the liberty interest implicated by California's parole laws regarding indeterminate sentences, i.e., parole suitability hearings, which if successful for the petitioner, will result in the establishment of an actual parole date (but never less than the minimum term):

1. A liberty interest exists, Irons v. Carey, __F.3d__, 2007 WL 656345 (9th Cir. 2007) citing cases;

2. Reliance on unchanging factors in denying parole suitability *might* implicate a violation of that liberty interest. Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir. 2003);

3. A finding by the Board of Parole Hearings (formerly BPT) (or at a later time, by the Governor) concerning the circumstances or gravity of the crime in and of itself is sufficient to deny suitability; In re Rosenkrantz, 29 Cal. 4th 616, 682, 128 Cal. Rptr. 2d 104, 161; Irons, at *5; but the nature of the offense must be "particularly egregious" to constitute a basis to deny parole suitability. Rosenkrantz, 29 Cal. 4th at 683, 128 Cal. Rptr. 2d at 161.

4. However, "particularly egregious" means nothing more than finding elements in excess of those "minimally necessary to convict." In re Dannenberg, 34 Cal. 4th 1061, 1095, 23 Cal. Rptr. 3d 417, 440 (2005);

5. If the petitioner has served less than the minimum term of his indeterminate sentence, "all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." Irons at *5, but see footnote 1 of Irons expressing no opinion if the prisoner has served more than his minimum term, i.e., *maybe* that is the time frame against which reliance on unchanging factors is truly suspect[1];

6. If the BPH determined that the crime was vicious, or performed in a callous manner, or the motive was trivial, and so forth – all factors relating to the circumstances of the crime – and such is adopted by the state courts on review, a federal court must find the state court decision(s) AEDPA-unreasonable before a writ of habeas corpus may be granted. Irons, supra.

With respect, after Irons, the undefined "mights" and "maybes" serve as an indecipherable present guide to knowing just when the liberty interest in parole may be violated by reliance on unchanging factors. Moreover, one does not know whether such reliance, if it is ever held to be insufficient, is based on passage of time alone, or is an uncertain blend of crime circumstances and passage of time. The state courts' adoption of the BPH (BPT[2]) or Governor's decision about the circumstances of the crime is now essentially unreviewable – at least prior to

---

[1] Nothing in California statutes or regulations, see Cal. Penal Code 3041, 15 CCR § 2402, would expressly so limit the decision of the BPH and Governor, thus the potential limitation must be of federal origin. However, as undue reliance on unchangeable factors has never been found thus far by the Ninth Circuit, the commencement point of the limitation, or the precise blend of crime circumstances and years since, has not been defined. We do know that in Irons, five times of application was insufficient. Irons did not decide that reliance on unchanging factors after the minimum term had been served was unlawful. We simply know that "maybe" that will be the case.

[2] The Board of Prison Terms recently had its name changed to the Board of Prison Hearings.

the expiration of the minimum term.  That is, the circumstances of the crime in terms of viciousness, callousness, triviality and the like, is essentially an unchanging value judgment whose correctness cannot often be disputed regardless of the time when such a judgment is made – right after the conviction, just prior to expiration of a minimum term, well after the expiration of a minimum term. [3]

      Review of the federal appellate cases demonstrates that no guided finding of undue reliance on unchanging factors can be made in this case.  Biggs v. Terhune, supra, the case that commenced the discussion on unchanging factors, involved the first degree bludgeoning murder of a witness facilitated, but not committed, by Biggs.  He was denied parole eligibility at his initial hearing in 1999 in part because of the gravity of the crime.  All might agree that such a murder was grave, and it will never be properly classified as anything but such.  Nevertheless, the Ninth Circuit found that "continued reliance" on unchanging factors could violate due process.  Although not stating such, the intimation of Biggs was that the third or fourth time of reliance on the circumstances of the crime would be too much.  Certainly, it was not understood by the undersigned from reading Biggs that the time at which continued reliance would be too much would occur in 2010 – the time at which Biggs will have served his minimum term.  Biggs' minimum term is served in 2010, and Biggs will have had approximately 5 or 6 more hearings by that time.  However, subsequent Ninth Circuit cases have not upheld the undersigned's reading of Biggs.

---

[3] The undersigned has previously determined the arbitrary nature and lack of predictive value generally found in a circumstances of the crime parole suitability denial based on unchanging circumstances despite the passage of sixteen years and more from the date of the conviction coupled with an unblemished prison record.  See Irons v. Warden of California State Prison-Solano, 358 F. Supp. 2d 936, 947 (E.D. Cal. 2005).  That analysis, focusing on the predictive nature of the crime for future violence in combination with expert psychiatric reports or other forward looking evidence, has been cited with approval by the California Court of Appeal.  In re Elkins, 144 Cal. App. 4th 475, 50 Cal. Rptr. 3d 503, 522 (2006); In re Scott, 133 Cal. App. 4th 573, 34 Cal. Rptr. 3d 905 (2005).   However, since that analysis only received the comment that it was an "understandable [AEDPA] error" in the concurrence of Judge Reinhardt, that analysis concerning the trigger time of undue reliance will not be utilized herein.

In Sass, no comparison review of other cases was undertaken, there was simply the one sentence holding that the "evidence of Sass' prior offenses [prior DUIs] and the gravity of his convicted offenses [DUI resulting in a death and injury] constitute some evidence to support the Board's decision." Id., 461 F.3d 1123; the dissent disagreed, and found AEDPA unreasonableness. The Ninth Circuit was reviewing a third denial of suitability. If jurists of the Ninth Circuit cannot agree whether the circumstances of the crime can constitute some evidence given three hearings, how will the BPH or the undersigned know when to stop using the circumstances of a crime as the reason to deny parole eligibility. What will be the analytical watershed point of departure from routinely upholding the BPH assessment of the circumstances of the crime, and more importantly, why? Will the fourth hearing be sufficient, or should it be the seventh? Will the analysis simply hinge on the non-analytical fact that Sass will have passed his minimum terms of years under his sentence? Would a later BPT finding of egregiousness be AEDPA unreasonable simply because Sass just passed his minimum term as opposed to just before the expiration of his minimum term? None of these questions have been answered.

In Irons, after five parole suitability hearings, the Ninth Circuit determined that the second degree murder of a perceived thieving drug dealer by a wildly shooting, and then stabbing, angry "victim" of the deceased was comparatively more egregious than the murder in Sass. Perhaps so; perhaps other jurists would locate this line in another position because of the societal impact that drunk drivers impose in this country. Both positions have their points. But one can validly question whether the ultimate goal of every parole eligibility hearing, determining *future* safety of the community, can forever be based on personal judgments on the comparative seriousness of crimes committed decades ago.

Nevertheless, taking an implied cue from Irons that the minimum term might serve as an analytical change point, the undersigned finds that prior to that time, absent extraordinary circumstances, the BPH determination on factors relating to the circumstances of the crime are essentially unreviewable, i.e., the determination constitutes "some evidence"

8

sufficient to deny parole eligibility (suitability).

This case cannot be decided on the above finding because petitioner's (Lopez) incarceration has exceeded his minimum term. Even at fifteen years, he surpassed his minimum term in 1998. Petitioner was denied on his *ninth* suitability hearing.

Nearly the same day as Irons was decided, the Ninth Circuit reversed a grant of parole eligibility in Kunkler v. Muntz, 2007 WL 683970 (9th Cir. 2007).[4] The facts of the second degree murder were not set forth in the opinion, but the fact of Kunkler's 1983 conviction, and the fact that Kunkler had been considered for parole suitability *ten times* were set forth. Kunkler had been imprisoned well beyond any minimum term. On his last two BPT (now BPH) hearings, the commissioners had found Kunkler suitable for parole, but the Governor reversed both decisions in part on his perception of the seriousness of the crime. Indeed, this was *the* ground on which the state courts in unpublished orders had ultimately upheld the Governor's decision. The district court applied the Biggs dictum regarding reliance on unchanging factors. In reversing the district court, the Ninth Circuit, citing Sass, viewed the Biggs dictum as merely advice to the *next BPH panel* that it might wish to depart from its continued reliance on a non-changing factor. Kunkler at *2 ("'it is not [this court's] function to speculate about how future parole hearings could proceed.'"). Evidently, no matter how many times the BPH and/or the Governor utter an undoubtedly correct conclusion that a murder is serious, or a motive trivial, or that the victim suffered, these unchanging factors will always constitute "some evidence" in federal habeas corpus review.

In petitioner's case before this court, the BPT found that the offense was carried out in a cruel and callous manner (true, but unchanging), in a dispassionate and calculated manner (the seeming antithesis of the facts of the case), and that the offense demonstrated an

---

[4] Unpublished Ninth Circuit decisions may be cited commencing with decisions issued in 2007. Ninth Circuit Rule 36-3. Although still not precedential in the binding sense, the unpublished decisions do have a certain amount of persuasive value, and indicate how Ninth Circuit judges apply binding precedent.

9

exceptional disregard for human suffering (true, but what will never change about this), and the motive was unexplained (but the Commissioners believed it to be attempted rape). Nevertheless, in light of the above authority, the undersigned cannot find at this time that the state courts in this case were AEDPA unreasonable by failing to reject the unchanging circumstances conclusion of the BPT. Thus, as a matter of law, some evidence existed to satisfy the standards of the parole suitability liberty interest.

Because circumstances of the crime alone can constitute some evidence, there is no point in discussing the other factors of parole suitability, and whether some evidence existed for the conclusions reached in the other factors by the BPT.[5]

*Conclusion*

If the undersigned were reviewing this matter on a clean slate, the undersigned would not analyze the liberty interest involved merely by reference to a checklist of crime circumstances and whether the BPH understood that a murder was serious. Nevertheless, no binding authority at present would require more than use of the checklist for the circumstances of the crime factors as "some evidence" upon which to deny parole suitability.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

---

[5] Rosenkrantz also required that the then BPT also make an individualized consideration of the other factors regarding parole suitability. Of course, the Commissioners always make such a determination as the Commissioners know that they must. Whether these determinations are supported by some evidence is another matter, but as long as the consideration is made, the circumstances of the crime are sufficient to deny suitability.

shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: 3/20/07

/s/ Gregory G. Hollows
_____
GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

lop1628.157